# 𝕮𝖆𝖘𝖊𝖘

DETERMINED IN THE

# FIFTH DEPARTMENT

AT

# GENERAL TERM,

## September, 1892.*

THE PEOPLE OF THE STATE OF NEW YORK EX REL.
CHARLES F. POND, APPELLANT, *v.* THE BOARD OF
SUPERVISORS OF MONROE COUNTY, RESPONDENT.

*Apportionment of members of assembly, under chapter 397 of the Laws of 1892,
unequal and unconstitutional — New York Constitution, art. 3, secs. 4 and 5.*

The New York Constitution (art. 3, §§ 4 and 5) provides that, for the purpose of
apportioning members of the senate and assembly, each senate district shall
contain, "as nearly as may be, an equal number of inhabitants, excluding aliens
and persons of color not taxed;" and as to members of assembly, it provides
that they "be apportioned among the several counties of the State by the
legislature, as nearly as may be, according to the number of their respective
inhabitants, excluding aliens." Every county, with one exception, is entitled
to at least one member of assembly.

The legislature, at an extraordinary session convened in April, 1892, by chapter 397
of the laws of that year, made an apportionment, under which three members
of assembly were allotted to the county of Monroe, and its board of supervisors,
on the ground that the act was unconstitutional, refused to comply with a
direction of the act requiring the board to divide the county into so many
assembly districts as it was entitled to under this act.

In a proceeding taken by *mandamus* to compel the board to do so, it appeared
that, according to an enumeration taken under chapter 5 of the Laws of 1892,
the ratio of representation for an assembly district was 45,241; that Monroe
county had a representative population of 181,230, and was given but three mem-

---

* Extraordinary General Term, held September 13, 1892.

bers, while Albany county, with a population of 156,348, was given four members; that Dutchess county, with a population of 75,078, was given two members, while St. Lawrence county, with a population of 80,679, was given but one; and that similar inequalities existed in the counties of New York and Rensselaer.

Upon an appeal from an order denying the application for a *mandamus:*

*Held,* that the provisions of the Constitution, concerning the time at which the apportionment shall be made, were mandatory, and not directory. (Per LEWIS, J.,

*Semble,* that such provisions, as to the time at which an enumeration shall be made, are mandatory, and not directory. (Per LEWIS, J.)

That an extraordinary session, called by the governor, of the same legislature by which an enumeration is directed, is not a session at which an apportionment can be made under such enumeration. (Per LEWIS, J.)

That the apportionment was unconstitutional and void.

That the inequalities complained of were a violation of the constitutional requirement.

That they were so flagrant as to preclude the idea that they were other than intentional. (MACOMBER, J., dissenting.)

APPEAL by the relator, Charles F. Pond, from an order of the Supreme Court, entered in the office of the clerk of the county of Monroe on the 8th day of August, 1892, denying a motion for a *mandamus.*

The motion came on to be heard pursuant to an order to show case why a peremptory *mandamus* should not issue, directed to the Board of Supervisors of the County of Monroe, commanding the said board of supervisors to forthwith convene and to proceed to divide the said county into three assembly districts and to make their certificates in duplicate, containing a description of each assembly district, specifying the number of each district and the population thereof, according to the last State census, and to cause said certificates to be signed by a majority of the said board of supervisors, and to cause one duplicate thereof to be filed in the office of the secretary of State and one in the office of the clerk of the county of Monroe.

An enumeration was taken, under chapter 5 of the Laws of 1892, upon which the apportionment complained of was based.

The opinion of the court below, by RUMSEY, J., is as follows:

RUMSEY, J.:

On the 30th of April, 1892, at an extraordinary session of the legislature, called for that purpose, an act was passed to organize the senate districts and to apportion the members of assembly. By

that act there were allotted to the county of Monroe three members of assembly. The act required that the boards of supervisors of counties which were entitled to more than one member should meet on the third Tuesday of July and divide their respective counties into so many assembly districts as they were entitled to. The supervisors of Monroe county met on that day, but refused to proceed under the act, alleging as a reason that it was not constitutional. Thereupon the relator moves for a writ of *mandamus* to compel them to act.

It appears that the relator is a citizen of Rochester, Monroe county, and an elector thereof. It further appears that the city of Rochester, with a citizen population of 129,355, constitutes one assembly district, and that the remainder of the county, with a citizen population of 51,875, is divided into two districts, thus giving to 25,937 people in the towns the same representation in the assembly as is given to the entire population of the city. In this way the people of the city of Rochester, including the relator, are deprived of their proper representation in the assembly by the refusal of the supervisors to act as the bill directs.

That the writ of *mandamus* is the proper remedy in such a case, and that the writ may be sued out at the relation of a citizen and elector has so recently been decided by the highest court of this and other States that no discussion upon that point is necessary. (*People ex rel. Derby* v. *Rice,* 129 N. Y., 461; *People ex rel. Daley* v. *Rice,* id., 449; *People ex rel. Giddings* v. *Blackner, Secretary of State,* Sup. Ct. of Mich., July 26, 1892; *People ex rel. Stephens* v. *Halsey,* 37 N. Y., 344.) The relator, therefore, is entitled to have the writ issued, unless the defendants have shown a good reason why it should be denied.

It seems to be forgotten, sometimes, that the supreme law of the State is the Constitution, and that obedience to that instrument is obligatory, not only upon the courts and the legislature, but on all citizens and officials whatsoever. In yielding that obedience, it is the duty of each officer of the State, when called upon by statute to do any act, to examine whether such statute is within the Constitution. As is said by Judge COOLEY: "Every official of every department may, at any time, when a duty is to be performed, be

required to pass upon a question of constitutional construction." (Cooley's Const. Lim., 41.) If any act of the legislature violates the Constitution, it is a nullity and as if it had never been. No rights can be acquired by it and no duty imposed. (*Chenango Br. Co.* v. *Paige*, 83 N. Y., 178, 191; *Boston & Gunby* v. *Cummins*, 16 Geo., 102; *Bailey* v. *P. W. & B. R. R. Co.*, 4 Harr., 389; *Taylor* v. *Porter*, 4 Hill, 140.) Boards of supervisors are as much bound to regard the Constitution as are any other officials, and if a law, so called, seeks to compel them to do some act which the Constitution does not authorize, it is their duty, like that of every other person, to obey the fundamental law and pay no attention to the decree which violates it. It is quite true that they may refuse obedience to the statute at their peril if disobedience is followed by a penalty, provided they are mistaken in their judgment and the statute is constitutional. But none the less they are bound to look first at the fundamental law made by the people and give that their first and highest obedience; and if any peril is involved, it is one of those things which is inherent in the holding of official position. Following this well-settled rule, it has recently been held by the Court of Appeals that no public officer can be compelled by *mandamus* to do any act which involves the violation of a constitutional provision or which the law does not require him to do. (*The People ex rel. Sherwood* v. *Board of Canvassers*, 129 N. Y., 360, 370 *et seq.* ; *Same* v. *Rice*, id., 391.)

Therefore, the board of supervisors not only had the right, but it was their duty, if the act of apportionment was a violation of the Constitution, to refuse to obey it, and if they are right in that judgment no *mandamus* can issue to compel them to do so.

We are directly and necessarily brought, then, to an examination of the constitutionality of the apportionment act. That question being necessarily involved in the case is not to be evaded or declined. But before proceeding to it, it is well to recall some rules which have been adopted by the courts for their guidance in the discussion of such questions.

In the first place, it is settled that there can be no presumption that the legislature had any but public and proper motives in view in the passage of any act. The question of constitutionality is one solely of power in the legislature. (Cooley's Const. Lim., 186.)

In the second place, no act of the legislature can be adjudged unconstitutional, unless it is either expressly or by necessary implication in conflict with the fundamental law. (*People ex rel. Wood* v. *Draper*, 15 N. Y., 532, 543; Cooley's Const. Lim., 168 *et seq.*)

Springing out of this rule is the further principle that if there be any well-founded doubt whether the act be unconstitutional such doubt should be resolved in favor of the law. (*Ogden* v. *Saunders*, 12 Wheat., 213, 270; Cooley's Const. Lim., 182.)

But while these rules are well settled and will always be followed, because they only are consistent with the respect which the courts must show to a co-ordinate power of the State, still it is also settled, as stated by Judge ALLEN, that an act violating the true intent and meaning of the instrument and in evasion of its terms, as properly interpreted and understood, and frustrating its general and clearly expressed or necessarily implied purpose, is as clearly void as if in express terms forbidden. (*People ex rel. Bolton* v. *Albertson*, 55 N. Y., 50, 55.)

It will not be denied that the power to change its own organization and to create new units of representation is not inherent in the legislature, and that it is one which that body could not exercise, unless it had been granted by the Constitution. Unlike most of the powers which are exercised by the legislature, it is not necessarily involved in the power to make laws. If the Constitution did not give it, no legislature would presume to exert it.

The composition of the legislature and the boundaries of the several districts are established, in the first instance, by the people in their Constitution. When so established they must continue as made, unless the people see fit to change them, or unless they authorize some one else to do it. The power, then, having its origin in the Constitution is limited by that instrument and must be exercised in the manner therein prescribed. The general rule is that, to the due execution of a power there must be a substantial compliance with every condition required to precede it or to accompany its exercise. (*Allen* v. *De Witt*, 3 N. Y., 276, 278.) Especially is this the case where the condition and limitation of the manner of executing a power is contained in the Constitution. The fundamental law, it is said, is presumed to be, and, indeed, is prepared with the very greatest deliberation and adopted only after every opportunity for

reflection upon the meaning of each word has been had by different legislatures and by the people at large. (*People ex rel. Gilbert* v. *Wemple*, 125 N. Y., 485, 490.)

These limitations upon the manner of exercising the power cannot be deemed to be merely directory. It is absurd to suppose that the people have carefully prescribed the manner in which so important a duty shall be performed, for no other purpose than to advise the legislature, and then have left that body to follow the directions or not at its pleasure. If directions are given respecting the times or modes of proceeding in which a power should be exercised, there is, says Judge COOLEY, at least a strong presumption that the people designed it should be exercised in that time and mode only. (Cooley's Const. Lim., 79, 81.) Indeed, I am firmly persuaded that the principle which allows any provisions or limitations of the Constitution to be construed as directory, and not as mandatory, is pernicious and dangerous, and such construction is not in accordance with the weight of authority in this State at least. (*People* v. *Purdy*, 2 Hill, 31, 36, 37; *People ex rel. Crowell* v. *Lawrence*, 36 Barb., 177, 185; *People ex rel. Bolton* v. *Albertson*, 55 N. Y., 50, 55; Cooley, *supra*.) In the case of *People ex rel. Scott* v. *Supervisors of Chenango* (8 N. Y., 317), Judge WILLARD expressed the opinion that the requirements of the Constitution, that the yeas and nays, upon the final passage of a bill, shall be entered on the journal was directory, but that holding was purely *obiter*, because he had already held that, as matter of fact, they had been so taken and entered in the case in question (Cooley's Const. Lim., 79), and, therefore, the case is no authority on that point.

The Constitution prescribes that an enumeration of the inhabitants of the State shall be taken under the direction of the legislature in the year 1855, and at the end of every ten years thereafter, and that the senate districts shall be so altered by the legislature at the first session after the return of every enumeration, that each senate district shall contain, as nearly as may be, an equal number of inhabitants, excluding aliens and persons of color not taxed. It is provided further, in the next section, that the legislature at the first session after the return of every enumeration shall apportion the members of assembly among the several counties, as nearly as may be, according to the number of their respective inhabitants, excluding aliens.

But each county shall be entitled to one member of assembly whatever its population, except that Fulton and Hamilton constitute one county for this purpose. It is by virtue of this constitutional provision that the apportionment act was passed, and the objections to it based upon these sections are :

1. That the enumeration upon which it was based was taken in 1892, and not at a tenth year after 1855.

2. That the extraordinary session at which the act was passed was not the first session after the return of the enumeration within the constitutional provision.

3. That the senate apportionment is unconstitutional, because in estimating the number of inhabitants in the new senate districts persons of color not taxed were included.

4. That both senate and assembly apportionments are unconstitutional, because the senate districts are grossly unequal in number of inhabitants, and the members of assembly are not apportioned among the counties, as nearly as may be, according to the number of citizen inhabitants, but that command of the Constitution is ignored.

I am quite clear that the census for purposes of apportionment cannot be taken until the time prescribed in the Constitution has arrived.

Whether, if not then taken, it may be taken at the earliest moment afterwards and a valid apportionment may be based upon a census then made, might be doubtful if it were an original question. But I am of the opinion that the question, as well as the question whether the apportionment may be made at an extraordinary session of the legislature, has been practically decided by courts of high authority, and, therefore, I shall not ·consider them. (*Rumsey* v. *People*, 19 N. Y., 45 ; *State* v. *Cunningham*, 51 N. W. Rep., 724, 740.)

It is quite clear that the constitutional census, as it may be called, furnishes the only information for the legislature to use in reorganizing the senate and assembly districts. (*Rumsey* v. *People*, 19 N. Y., 41, 46 ; *Lanning* v. *Carpenter*, 20 id., 447 ; Opinions of the Justices, 142 Mass., 601.) The apportionment is a continuing process, beginning with the enumeration of voters and ending with the division into districts. (Opinions of the Justices, 142 Mass., 601, 605.) Being one entire act, all parts of it are to be examined in construing it. The law directing the census upon which the

apportionment was based makes no provision for ascertaining the number of persons of color not taxed, and there is not contained in the return to the legislature any information on that subject. That there are large numbers of such persons in the State who are citizens appears by the papers; and if it did not so appear, I have no doubt that the court would be obliged to take judicial notice of so notorious a fact with regard to the population of the State. (*Kernitz* v. *Long Island City*, 50 Hun, 428; *Howard* v. *Moot*, 64 N. Y., 262; *Mayor, etc.,* v. *Sands*, 105 id., 210.) The number of such persons was not deducted from other citizens in reorganizing the senate districts. It is clear that the Constitution requires that they should be excluded. Such is not the rule in apportioning members of assembly. The people struck out the provision excluding persons of color not taxed from assembly representation in 1874, but they retained it as to senators. Why it was so retained does not appear nor is it important. It is sufficient that they have so ordained. It has not been unusual that the senate or upper house of the legislature of a State should represent a different class of people than the other house. By the Constitution of 1777 the members of assembly were apportioned upon the number of electors and the senators upon the freeholders possessing freeholds of the value of one hundred pounds sterling. The idea was abandoned in 1821, and the representative population for senators and assembly-men remained the same until 1874, when the Constitution, as to members of assembly, was amended so as to place persons of color not taxed among the assembly representative population, leaving the senate representative population untouched. It may be that the doing of this was an oversight; but that it was done and that as the result of such action the apportionment of senators still is to be based upon the number of citizens, excluding persons of color not taxed, cannot be denied. It is claimed by counsel for relator that this exclusion of persons of color is a violation of the fourteenth and fifteenth amendments to the Constitution of the United States. As to the fifteenth amendment it is sufficient to say that it protects alone the right to vote, which is not affected by the provision of the State Constitution now in question.

The fourteenth amendment prohibits the abridgment by any State of the privileges or immunities of citizens of the United States.

The privileges thus protected are privileges of citizens of the United States as such, and not those which attach to the citizens of any particular State.  Any State may regulate the political rights of its own citizens, except as prohibited by the fifteenth amendment, but it cannot deprive the citizens of other States, who become its citizens, from sharing the rights which the like class of citizens enjoy under its government.  Thus far, and no farther, the States are controlled by the fourteenth amendment. . (*Slaughter House Cases*, 16 Wall., 36; *Presser* v. *Illinois*, 116 U. S., 252.)  This direction of our Constitution, then, is not prohibited by the national fundamental law. It is precise, clear and positive.  It leaves nothing to the discretion of the legislature.  It is quite clear that it was ignored by the legislature in passing the enumeration law and the apportionment act based on the census taken under it.

It was as clearly the duty of the legislature to give effect to this direction as to any other positive instruction of the people contained in the fundamental law.  That body is quite as much bound by the Constitution as any other collection of citizens. (*People ex rel. Bolton* v. *Albertson*, 55 N. Y., 50.)  It has no dispensing power.  It is true that the people can impose no punishment on the legislature for disobedience, but the fact that one is only bound by his honor to obey the wishes of his superior furnishes, not infrequently to honorable men, the very strongest reason for implicit and careful compliance with such commands.  This command was not obeyed and I see no escape from the conclusion that the act in that regard violates the Constitution.

The next objection taken to the act is that it violates that injunction of the Constitution that the senate districts shall contain, as nearly as may be, an equal number of inhabitants, and that the assemblymen shall be apportioned among the several counties, as nearly as may be, according. to the number of their respective inhabitants.

The Constitution prohibits the division of a county in the formation of a senate district, unless such county shall equitably be entitled to two or more senators, and requires that each county, however small its population, shall have at least one member of assembly, Fulton and Hamilton being rated as one county for that purpose. A statement of the inequalities will show how far they are due to

a compliance with these provisions, which must necessarily prevent exact equality of population in the several districts.

The representative population of the State, as shown by the return made to the legislature, is 5,790,865, so that the population of each of the thirty-two districts, if all could be equal, would be 180,899. The country districts contain the following population : Sixteenth, 199,674; seventeenth, 176,341; eighteenth, 165,699; nineteenth, 156,748 ; twentieth, 176,139; twenty-first, 229,005; twenty-second, 215,947 ; twenty-third, 196,481 ; twenty-fourth, 183,732; twenty-fifth, 201,017; twenty-sixth, 207,566; twenty-seventh, 169,499; twenty-eighth, 181,230 ; twenty-ninth, 185,922; thirty-second, 176,028.

It will be noticed that the twenty-first to the twenty-sixth districts, inclusive, contain 1,233,748, or an average population of 205,642, being, altogether, 148,354 more than the ratio, while the seventeenth, eighteenth, nineteenth, twentieth and twenty-seventh contain 844,393, or an average population of 168,879, and altogether 60,100 less than the ratio.

Yet in these eleven districts are forty counties lying in one body, varying in population from 4,784 to 156,748, so that almost any division would seem possible of them.

In New York county, where the districts are divided by street lines so that there is no difficulty in equalizing the numbers, the variation is still more remarkable ; the ninth district has 164,936 and the tenth 206,463. The eleventh, twelfth and thirteenth districts are carved out of the nineteenth and twenty-second wards, with part of the twelfth and twenty-third wards, and they lie together. Yet the eleventh contains 166,175 ; the twelfth, 105,720, and the thirteenth, 241,138. Albany county, with 156,748 people, is made one district. Erie county, with 304,712, is made into two districts. If the proportion between city and country be taken, the result is still more strange and unjust. New York, Putnam and Westchester are together formed into nine districts, with an average population of 174,059, or 6,840 each less than the ratio, while the remainder of the State has twenty-three districts, with an average population of 183,666 or 2,767 each more than the ratio. If New York alone had been divided into eight districts, each would have had an average of 177,248, or each one 3,651 less than the ratio, leaving to the State

at large twenty-four senators, or an average of one to 181,952, or 1,053 more than the ratio, which then would have given New York an advantage over the rest of the State.

New York, Westchester, Putnam, Kings and Richmond compose fourteen districts, with an average population of 177,292, or each 3,607 less than the ratio, leaving the rest of the State with eighteen senators, representing an average of 183,819, or 2,920 over the ratio. New York, Westchester, Putnam, Kings, Richmond, Albany and Erie have seventeen senators, representing an average of 173,151, or each 7,748 less than the ratio, while the remainder of the State has fifteen senators, representing each 189,819, or an average of 8,920 each over the ratio.

In the apportionment of assemblymen we see that Albany, with 156,784 people, has four members, while Monroe, with 181,230, has three, which is the same number given to Rensselaer with 121,679, and to Queens with 123,974. Dutchess, with 75,078, has two members, while St. Lawrence, with 80,679, and Chautauqua, with 73,884, have each but one.

The unnecessary inequality of much of this apportionment is quite manifest. For instance, if New York had been divided into eight districts, each would have had, as we have seen, an average population much nearer the true ratio than its districts now have. Albany united with either Greene or Schoharie or Schenectady, would have been quite nearer the true ratio than now, while, if Niagara had been added to Erie, the two districts which might have been formed would have been quite near the true number. These suggestions are made simply to show that some of the inequalities of the senate districts are clearly unnecessary, and that the districts do not contain, " as nearly as may be," an equal number of inhabitants. With regard to the apportionment of assemblymen among the counties mentioned above, the unnecessary inequality is clearly apparent. It needs no argument to show that the Constitution means what it says when it requires that each district shall contain, as nearly as may be, an equal number of inhabitants, and that the members of assembly shall be apportioned among the counties, as nearly as may be, according to the number of inhabitants. Such provisions, or equivalent ones, are contained in the constitutions of a majority of the States

and of the United States. It is the intention of the people that each person shall have, as nearly as possible, the same influence in the government as any other person, so that the representation of the Constitution shall be of all the citizens equally. In the Constitution of 1777 it was required that if upon the census it shall appear that the number of representatives in assembly from the counties is not justly proportioned to the number of electors in said counties, respectively, that the legislature do adjust and apportion the same by that rule. In that Constitution, as in each subsequent one, it was recognized that it was necessary that there should be a fair and just representation in the legislature of all those entitled to be represented there at all. I shall take no time to establish what must be and is conceded, that the people intend that representation in senate and assembly shall be as nearly equal as possible.

In the year 1885 an enumeration act was passed by the legislature, but vetoed by the governor.

Since that time there have been constant complaints that the representation in either house of the legislature was not just or equal, and a continued demand that it be adjusted. These very complaints show the understanding of the people that the representation in the legislature should be proportioned to numbers. They show also that the apportionment demanded is an equal and just one, based, as the Constitution requires, upon the number of inhabitants so far as may be, and not an arbitrary and unequal distribution.

But it is said that this matter is left to the discretion of the legislature and that discretion cannot be reviewed by the courts. That some discretion in that regard is vested in the legislature cannot be denied, as it must have been left in the nature of things. But it is just as clear that the discretion is not absolute, because it is expressly directed that the apportionment should be equal, "as near as may be."

As is said by Judge SHIPLEY (18 Maine, 472), " the very language limits, or, more properly, prohibits any such discretion by declaring that the conformity shall be ' as near as may be,' that is, as near as it may be practicable to make them, having regard to the number of inhabitants. The language must have been used to define the rule, not to permit a departure from it at discretion, however soundly and justly exercised it might be. If there may be a sound and a just exercise of

discretion, it cannot be overlooked that there may also be an unsound and unjust exercise of it, if it be permitted at all in any other case than when it arises out of an absolute and ·moral necessity. And between such a discretion and any other there is this great and favorable distinction. It finds its own certain limit in the necessity which gave rise to it, and it can extend no further than that necessity requires that it should; and it is not, therefore, liable to be abused. And this is the only discretion that can in this case be admitted."

There is a wide distinction between such a limited discretion and the absolute power in the legislature to do as it pleases. It must be remembered that the making of an apportionment is not like the passage of a law, a matter which is to be done or not as the legislature sees fit. It is an absolute duty imposed by the people, without a sanction, it is true, but none the less a duty. The manner of performing this duty is also prescribed. The provision of the Constitution, as I have shown above, is mandatory, and not by way of advice or suggestion only. The limited discretion to be exercised is not a mere arbitrary one, but one to be extended only as far as may be necessary. When it appears, as it does here, that the narrow and limited discretion is departed from so widely that it cannot possibly be accounted for on the ground of necessity or even of convenience, then the conclusion is inevitable that no constitutional discretion has been used. But the people have expressly required that the limit of necessity should be observed.

The power to apportion is limited by the conditions of the grant, and these conditions inhere in it. When the legislature disregards them it goes beyond its constitutional· power. If the constitutional limits are overstepped and the legislature enacts that which the people have forbidden, I see no reason why the courts should not take their stand at that point and assert the supremacy of the fundamental law. As is said by Judge ALLEN : " Usurpations of power or the exercise of power in disregard of the express provision or plain intent of the instrument, as necessarily implied from all its terms, cannot be sustained under the pretense of a liberal or enlightened interpretation or in deference to the judgment of the legislature or some supposed necessity." (*People ex rel. Bolton* v. *Albertson,* 55 N. Y., 50, 55.)

It is well known that since 1845, not only in this State, but throughout the country, the tendency of the people has been to limit and confine the power and authority of the legislatures. Whether this arises from a distrust which the people have for the members of their legislatures, as Mr. Bryce asserts, or from the jealousy of power which seems to be inherent in the people, it is not necessary to inquire. Everyone recognizes a tendency in all legislatures to evade constitutional restrictions in every possible way. It is fair to suppose that the people meant these restrictions to be effectual to control the acts of their law-makers, and as they can impose no punishment for their violation there is no other sanction than for the courts to insist to the fullest reasonable extent upon their undoubted power to apply to every law the constitutional test and insist that that instrument shall be obeyed. The case seems to me one of those where that power of the court should be exercised.

The conclusion I have reached that the action of the legislature in apportioning the senate districts and assemblymen is subject to review by the courts is sustained by many adjudged cases of high authority. (*State* v. *Cunningham,* 51 N. W. Rep., 724, and cases cited on page 728; *People ex rel. Giddings* v. *Blacker,* Sup. Ct. of Mich., July 26, 1892; *People ex rel. Van Bokkelen* v. *Canaday,* 73 N. C., 198.)

In the first two cases last cited the flagrant and unnecessary inequalities of the apportionment were conceded, and the serious question presented in each was whether the limited discretion reposed in the legislature was the subject of review in the courts. In each of those cases the decision of the courts was unanimous and the court declared the apportionment void for the sole reason that it was manifestly and needlessly unfair and unequal.

The constitutional provisions on the subject are in each of these States substantially the same as in New York, and the decisions are express authority upon the point. The length of this opinion, however, prevents extended quotations from them.

There can be no doubt that the apportionment of several senate districts is so manifestly and flagrantly unequal as to amount to a clear violation of the constitutional requirement, as is also the undoubted disparity between the number of inhabitants in the country as dis-

-tinguished from the city districts. It is clear, too, that the Con-stitution was grossly disregarded by giving to Albany county one more member of assembly than is allotted to Monroe, with over 24,000 more inhabitants, as well as by allowing to Dutchess county, with 75,078 people, two members, and to St. Lawrence, with 80,679, only one. These are violations which are clearly, utterly unneces-sary, and because of them the act is void.

The provisions of an act of this kind are so largely dependent upon each other that if part of them violate the Constitution the whole act must be declared void. (*State* v. *Cunningham, supra.*)

For these reasons the motion for a *mandamus* is denied, with costs.

*C. D. Kiehl*, for the appellant.

*W. A. Sutherland* and *Charles Daniels*, for the respondent.

LEWIS, J.:

By section 5, article 3 of the Constitution, it is made the duty of the board of supervisors of such counties as may be entitled, under an apportionment, to more than one member of assembly, to assem-ble at such times as the legislature making the apportionment shall prescribe, and divide their respective counties into assembly districts equal to the number of members of assembly to which the county is entitled.

By act chapter 397 of the Laws of 1892, entitled "An act to organize the senate districts, and for the apportionment of the members of assembly of this State," three members were allotted to the county of Monroe. The act required the board of supervisors to meet on the third Tuesday of July, 1892, and proceed to divide their respective counties into so many assembly districts as they are entitled to respectively, and make and file the proper certificates. The board of supervisors of Monroe county convened on the day designated, but refused to divide their county as required by the act, for the reason avowed, that the board was advised by counsel that the act aforesaid is unconstitutional and void upon various grounds stated in resolutions adopted by the board. Thereupon a motion was made at the Monroe Special Term, *ex rel. Charles F. Pond*, a resident citizen and elector of Rochester, for a *mandamus*

commanding the board to convene and proceed with the division of the county, as directed by the act. The motion was denied and an appeal was thereupon taken to this court from the said order. The constitutionality of the act is assailed for reasons which will hereafter be mentioned.

Section 4, article 3 of the Constitution, provides that " An enumeration of the inhabitants of the State shall be taken under the direction of the Legislature in the year 1855, and at the end of every ten years thereafter, and that the said districts shall be so altered by the Legislature at the first session after the return of every enumeration, that each Senate district shall contain as nearly as may be, an equal number of inhabitants, excluding aliens and persons of color not taxed, and shall remain unaltered until the return of another enumeration."

Section 5 provides that the legislature, at its first session after the return of every enumeration, shall apportion the members of assem bly among the several counties of the State. The legislature of 1885 passed an act providing for an enumeration. It met with an executive veto, and nothing farther was done, looking to an enumeration, until the session of 1892, seven years after the decennial year 1885, when an act was passed, which provided for the taking of a census, which required the Secretary of State to tabulate and arrange the returns of the enumerators and report the same to the legislature. An enumeration was made, and on the twenty-first day of April the Secretary of State made a report to the legislature of the result of such enumeration. On the day of the making of this report, and while the legislature was still in session, the Governor, by special message, called an Extraordinary Session of the legislature to convene on the following Monday, April 25, 1892. The legislature adjourned *sine die* April twenty-first, and again convened on the day designated, and on the thirtieth day of said month passed, and on the same day the Governor signed, the act chapter 397 aforesaid.

It is the contention of the respondent that there was no power in the legislature to pass this act in the year 1892, as that is not a decennial year; that the act was unconstitutional and void, because it was passed at the same session and by the same legislature under whose direction the enumeration was taken, and for the further reason that said Extraordinary Session was not a session of the legis-

lature, within the meaning of the Constitution, having the power under the Constitution to make the apportionment, and on the further ground that the apportionment was unequal and unjust.

It is the contention of the appellant that the provisions concerning the enumeration and apportionment are simply directory; and that, therefore, it is discretionary with the legislature when the enumeration and apportionment shall be made.

The Constitution, as has been seen, provides that the apportionment of the members of Assembly shall be made at the first session after the return of every enumeration.

First, then, are these provisions of the Constitution mandatory, or advisory simply?

That the people have the right, in their Constitution, to speak in mandatory language no one will question; they are the source of power; the Constitution emanates from them. They have the right to impose such limitations and restrictions upon powers they confer upon their servants as they choose. If important interests are involved, which may be jeopardized if the language be held to be simply advisory, it must be assumed that its authors intended to speak in mandatory terms. If the provisions under consideration are advisory simply, it follows that an apportionment may be made at any time that suits the wishes or plans of the party in power. If advisory only, an enumeration can be taken and a tabulated statement of the result delivered to the legislature, to be immediately followed by an apportionment, without any opportunity for its examination by the people, and the people may thereby be made victims of a party in power, who may, for partisan purposes, so manipulate and falsify an enumeration, and follow it by so arranging the senatorial districts and apportioning the members of Assembly, so as thereafter to place the control of the election of members thereafter, of both houses, under the control of a small minority of the electors. The districts could easily be so selected and arranged that a majority of the legislators could thereafter be elected by electors whose predilections were with the party making the apportionment and who composed but a small minority of the electors of the State, and the majority would be practically disfranchised; and as amendments of the Constitution can be secured only through and by the consent of the legislature, it would be practically impossible to

remedy the wrongs by lawful means. If directory only, there is no necessity for calling an extra session; the enumeration and apportionment may be consummated at one sitting of the legislature. Holding these provisions to be mandatory not only does no violence to the language of the Constitution, but accords with the common understanding of the people.

"Courts tread upon very dangerous ground when they venture to apply the rules which distinguish directory and mandatory statutes to the provisions of a constitution. Constitutions do not usually undertake to prescribe mere rules of proceeding, except when such rules are looked upon as essential to the thing to be done, and they must then be regarded in the light of limitations upon the power to be exercised. It is the province of an instrument of this solemn and permanent character to establish those fundamental maxims, and fix those unvarying rules by which all departments of the government must at all times shape their conduct; and if it descends to prescribing mere rules of order in unessential matters, it is lowering the proper dignity of such an instrument, and usurping the proper province of ordinary legislation. * * * If directions are given respecting the times or modes of proceeding in which a power should be exercised, there is at least a strong presumption that the people designed it should be exercised in that time and mode only. * * * There are some cases, however, where the doctrine of directory statutes has been applied to constitutional provisions, but they are so plainly at variance with the weight of authority upon the precise points considered, that we feel warranted in saying that the judicial decisions, as they now stand, do not sanction the application."

This is a quotation from Cooley's Constitutional Limitations (m. p., 78, 79). Judge EMOTT said, in speaking for the court in *People* v. *Lawrence* (36 Barb., 186): "It will be found, upon full consideration, to be difficult to treat any constitutional provision as merely directory and not imperative."

The same doctrine is held in *Brown* v. *Goben* (122 Ind., 113). Judge ORTON, in the *Wisconsin Apportionment Case* (51 N. W. Rep., 730), says: "That most dangerous doctrine that these and other restrictions upon the power of the legislature are merely declaratory, and not mandatory, should not be encouraged, even to the extent of

discussing the question.   The convention, in making a Constitution had a higher duty to perform than to give the legislature advice."

There is no part of the machinery of our State government which more vitally affects the interests of the people than the provisions for enumeration and apportionment.   Ours being a representative government, frauds which may tend to deprive the people of equal representation, especially in their legislative bodies, strike at the very foundation of our institutions, and naturally and inevitably tend to arouse bitter and vindictive feelings.   The people appreciating the importance of this matter naturally would wish, in this respect at least, to retain power in their own keeping, and direct how it should be exercised, and not leave its exercise to the discretion or caprice of their servants selected from time to time to represent them in the legislature.   While legislative acts sometimes speak in directory language, a Constitution has the right to speak, and should speak, only in words of command.   Upon the authorities referred to, and for the reasons suggested, the provisions under consideration must, we think, be held to be mandatory ; and if mandatory, it follows that the legislature had not the power to make the apportionment at the same session that the enumeration was taken.   Hence the question arises, was this Extraordinary Session, within the meaning of the Constitution, the first session after the return of the enumeration ?

Article 10, section 6 of the Constitution, provides that : " The political year and legislative term shall begin on the first day of January, and the Legislature shall, every year, assemble on the first Tuesday in January, unless a different day shall be appointed by law."   The legislative term, therefore, may begin before the meeting of the legislature.   It begins and ends with the year, and the life of a legislature also ends with the year.   A brief review of the provisions of the various Constitutions of the State relating to this subject may aid in the solution of this question.

The Constitution of 1777 provided that, as soon after the expiration of seven years subsequent to the termination of the present war as may be, a census should be taken, and that once in every seven years after the taking of the first census a new one should be taken.   No time or session was specified for making the appor-

tionment. The first census was taken in 1790, pursuant to chapter 7 of that year. The first apportionment by the legislature was made by chapter 4, Laws of 1791. The next census was in 1795. The apportionment was made by chapter 19, Laws of 1796. Another census was taken in 1801, pursuant to an act passed April seventh, chapter 175. An amendment to the Constitution was adopted October 27, 1801, providing that the legislature, "at their next session," shall apportion the number of assemblymen fixed by the said amendment, and make a reapportionment upon the return of every census thereafter. Accordingly, the legislature made an apportionment March 31, 1802. The next census was in 1807, pursuant to an act of April 3, 1807. The apportionment was made April 1, 1808. Another census was taken in 1814, act of April fifteenth. Apportionment was made by chapter 142, Laws of 1815. The Constitution of 1822 provided that an apportionment shall be made by the present legislature, according to the last United States census. That a census should be taken in 1825, and at the end of every ten years thereafter. That the senate districts shall be altered, and the apportionment of the members of assembly shall be made "at the first session after the return of every enumeration." The legislature accordingly made an apportionment by chapter 207, Laws of 1822. No State census had been taken since 1814. By chapter 100, Laws of 1825, the legislature provided not only for the taking of the census that year, but also for future years. The next apportionment was made by chapter 289, Laws of 1826. The act of 1825 was substantially incorporated into the Revised Statutes (vol. 1, p. 87), which took effect January 1, 1830. The census was taken in 1835; an apportionment made by chapter 436, Laws of 1836. The provisions of the Revised Statutes for the taking of the census were superseded by Laws of 1845, chapter 140, which was amended by chapter 239, Laws of 1854. These statutes were repealed by Laws of 1855, chapter 64. An apportionment was made by chapter 44 of the Laws of 1846, based upon the census of 1845. The Constitution adopted in 1846 is substantially the same as the Constitution of 1822, in so far as the particular matter here under consideration is concerned. The next census was taken in 1855; the apportionment was postponed until 1857. (Chap. 337.) Another apportionment was made by chapter 607, Laws of 1866,

based upon the census of 1865. Another enumeration was had in 1875, but no apportionment was made until 1879. (Chap. 208.) It will be observed from the foregoing that the invariable practice has been to make the enumeration at an annual session after the taking of the census. This is the first instance since these provisions were incorporated into the Constitution that the same Legislature has assumed to make both the enumeration and the apportionment. No census was taken in 1885 for the reason before stated.

The framers of our Constitution in providing that the apportionment should be made at the first session after the enumeration were aware that the taking of the census of this populous State would be a work of great labor and detail, necessarily more or less complicated, and that every step in the proceeding should be done deliberately and openly, so that the people would have an opportunity to watch its progress, and that a sufficient time should elapse between the completion of an enumeration and an apportionment to enable all who desired so to do to fully examine into the details; and to accomplish that, it was necessary that full and complete statements of the work of the enumerators should be deposited in some public office, there to remain for a sufficient time for full examination before the apportionment should be made.

The convention that framed the Constitution of 1846 was in session the year following the passage of chapter 140 of the Laws of 1845, which provided a complete plan for taking the census, with ample provisions for the deposit of the returns of the enumerators in public offices for the inspection of the people. Compliance with the provisions of this act would necessarily require all the time prior to the sitting of the annual session of the legislature in 1846. The members of the convention, we assume, were familiar with this act, and in preparing the provisions of the Constitution under consideration, it is reasonable to suppose, understood the importance of providing that the apportionment should not be made at the same session as the enumeration.

Another reason why the enumeration and apportionment ought not to be made by the same legislature is that if irregularities or frauds should occur in taking the census, the electors should have an opportunity at the polls to prevent the consummation of the fraud by

electing members of the legislature for the following year who had not taken part in the frauds.

If an extraordinary session of the same legislature is "a session," within the meaning of the Constitution, it would be within the power of a hostile Governor to prevent an apportionment by failing to recommend to the legislature that subject for consideration.

Section 4, article 4, provides: "At extraordinary sessions no subject shall be acted upon, except such as the Governor may recommend for consideration."

There have been many instances of Extraordinary Sessions of the Legislature since the State existed. The proceedings of the entire year, including those of the Extraordinary Session, have invariably been called and known and printed as the laws of but one session. This shows the meaning attached to the words "Session of the Legislature" by the people.

The Governor is required to communicate by message to the legislature at every session the condition of the State and recommend such matters to it as he shall judge expedient. No Governor has yet, so far as we are aware, considered this provision of the Constitution applicable to an Extraordinary Session of the Legislature.

Section 16 of article 6, prior to the amendment of 1879, provided that judicial districts might be re-organized by the legislature at the first session after the return of every enumeration, "and at no other time." The appellant's counsel concedes that this provision of the Constitution is mandatory. If so, the same embarrassment would arise if the Governor should fail to recommend that subject for consideration next after a regular session. To hold that an Extraordinary Session is, within the meaning of the Constitution, the first session, deprives the provisions under consideration of any effective meaning. They might as well have been left out of the Constitution, for they afford no safeguard or protection to the people. The history of the legislation under consideration is an impressive illustration of this fact, as there were but three days between the adjournment and the convening of the Extraordinary Session. The Constitution not having left this power of apportionment within the general delegation of legislative authority, the use of the phrase "first session" must be held to have both significance and effect. We are of the opinion that an Extraordinary Session of the same Legislature, under whose direc-

tion an enumeration is taken, is not, within the meaning of the provision under consideration, the first session. We are also of the opinion that the said provisions are mandatory.

We have carefully examined the cases of *Rumsey* v. *People* (19 N. Y., 45) and *State* v. *Cunningham* (51 N. W. Rep., 724), relied upon by the appellant's counsel as deciding that the provisions under consideration are merely directory, and do not think they are authority upon this question.

The case of *Rumsey* v. *People* holds that an apportionment may be made by a subsequent legislature when their predecessors have neglected their duty in that regard. The questions presented in the case at bar were not before that court for decision.

In the case of the *State* v. *Cunningham* (*supra*) the Supreme Court of Wisconsin adjudged an apportionment act void, because it was unequal and fraudulent. Judge PINNEY, in his opinion, suggests that another apportionment could be passed at a special session if one should be called. It was a casual suggestion, evidently made without an examination of the question, and was *obiter*. We have not been referred to, and are not aware of, any case deciding the questions here involved.

In the event that the legislature, for any reason, should fail to provide for an enumeration at the decennial year, as required by the Constitution, whether it could be taken by some succeeding legislature we do not deem it necessary to consider, for that question is not before us; nor is it necessary to pass upon the question whether an apportionment can be made at an Extraordinary Session. It undoubtedly could be so made, provided it was not a meeting of the same Legislature under whose direction the enumeration was taken.

The constitutionality of the Act under consideration is further assailed, for the reason that the provisions of the Constitution requiring that each Senate District shall contain, as nearly as may be, an equal number of inhabitants, and that the members of Assembly shall be apportioned among the several counties of the State, as nearly as may be, according to the number of their respective inhabitants, excluding aliens, was violated in the apportionment under consideration. The ratio of representation for a member of assembly, as shown by the enumeration, is 45,241. Monroe's representative population was 181,230; the county was, therefore, entitled

to four members, with a surplus population of 266. She was given but three. The population of Albany county was 156,348; she was, therefore, entitled to but three members, but was given four. Two members were awarded Dutchess county, with a population of 75,078, and yet but one was given to St. Lawrence county, with a population of 80,679.

These were not unintentional errors. The Constitution says: " The Members of Assembly shall be apportioned among the several counties of the State by the Legislature, *as nearly as may be*, according to the number of their respective inhabitants, excluding aliens." The case presents many other striking illustrations of gross and inexcusable irregularities in apportioning members of assembly and in arranging senatorial districts, etc. This point was so fully and ably discussed and illustrated in the opinion of Justice RUMSEY, at Special Term, that we do not deem it necessary to add anything, except to say that we fully concur in his conclusions. No one can read the figures and facts set out in the record and fail to come to the conclusion that the apportionment was a flagrant violation of the plain provisions of the Constitution; that it could not have been the result of the best judgment of the members of the legislature, but was a bold and partisan proceeding enacted and consummated with a view of giving to the party engineering the bill advantages in representation to which they were not in justice or in truth entitled.

Other points were presented and discussed by counsel which I do not deem it necessary to consider, for I prefer to put the decision upon the grounds discussed in this opinion; and for the reasons stated, I think the act, chapter 397 of the Laws of 1892, unconstitutional, which leads to an affirmance of the order appealed from.

DWIGHT, J.:

I concur in the affirmance of the order below on the ground that the legislative act in question involves a palpable violation of that requirement of the Constitution of the State which is intended to secure to the people, as nearly as practicable, equality of representation in their legislature. The requirement is clear, positive and mandatory, that " the members of Assembly shall be apportioned among the several counties of the State by the Legislature, as nearly as may

be, according to the number of their respective inhabitants." An apportionment which gives additional representation to the county of New York for an excess of population of only eighteen per cent of the ratio of representation, and withholds it from the county of Monroe, with an excess of seventy per cent of the ratio; which gives to Albany county, with an excess of twenty-one per cent, the additional representation which it denies to St. Lawrence, with an excess of sixty-five per cent, and to Rensselaer, with an excess of forty-nine per cent, the representation which belonged to Chautauqua with fifty-one per cent, palpably violates the constitutional injunction. From it result such anomalies as that Dutchess county, with a population less than that of St. Lawrence, receives double the representation of the latter; that Albany county, with less than twice the population of St. Lawrence, receives four times its representation, and that Monroe county, with 24,000 more population than Albany, receives one less representative. Here is no room for the theory of mistake or inadvertence. The just method of apportionment, which up to a certain point had been followed, was deliberately abandoned, and instead of awarding the three remaining members of assembly to those counties which, as among the six, had the largest fractions of population, they were arbitrarily awarded to those which had the least.

Shall it be said that the vice of this apportionment did not attach to the method employed, and, therefore, is not subject to the condemnation of the court? The vice resulted from the abandonment of method, and the substitution of might for right.

Probably the motive of legislators is not a necessary subject of inquiry when a violation of the Constitution is in question; but if it were so, that motive must be inferred from the act and its effect. The effect of the action complained of was to deprive some counties of the representation to which they were entitled under the Constitution, and to confer it upon other counties to which it did not belong. If this may be done in the case of three counties, it may be done in the case of as many more as may be deemed necessary to give to the party making the apportionment the control of the legislature for an indefinite time to come. It is against such possibilities as these that the injunction of the Constitution above quoted is provided. Other provisions in respect to the same subject may be

technical, or may relate to matter of form; this one is essential. It represents the cardinal principle of equality, which lies at the foundation of all representative government. It is not within the discretion of the legislature to disregard it. It cannot be wantonly violated without drawing down upon the act the condemnation of those tribunals which are set for the defense of the Constitution.

The order appealed from should be affirmed.

MACOMBER, J. (dissenting):

The relator, Charles F. Pond, is a citizen and elector in the city of Rochester, Monroe county. As such, he applied to the Special Term, upon an order to show cause, for a *mandamus* requiring the Board of Supervisors of Monroe County, which had adjourned without taking such action, to reconvene and divide the county of Monroe into three assembly districts in accordance with the terms of the last apportionment act of the legislature, being chapter 397 of the Laws of 1892. This motion was denied by the Special Term solely upon the ground that such act was unconstitutional and void, and that for that reason alone the defendant was not bound to obey the statute.

The right of the relator to complain of the non-action of the board of supervisors, and that the high prerogative writ of *mandamus* is the appropriate remedy, provided the act of the legislature be constitutional, are propositions not questioned by the learned counsel for the defendant, nor could they be successfully controverted under the decision in the cases of *People ex rel. Derby* v. *Rice* (129 N. Y., 461), and *People ex rel. Daley et al.* v. *Rice* (Id., 449). But the learned counsel for the relator does not, in turn, anywhere concede that the board of supervisors may defeat his motion by establishing the unconstitutionality of the statute, while, upon the most important proposition contained in the case, the power of the court in the premises is affirmatively denied by him.

This appeal comes up, not upon a case containing issues framed by appropriate pleadings and findings of fact and of law thereon, so that the scope of the decision below might readily be grasped and its several parts duly weighed, as was contemplated by the provisions of the Code of Civil Procedure (§§ 2067–2090), and as would have been advisable in a matter of this magnitude; but it is rather from an

order most general in its terms, and which nowhere points out the precise constitutional defect relied upon for the overthrow of this statute. Yet the mode of procedure resorted to is authorized by the Code; and when the special grounds of the order are ascertained, by resort to the opinion of the learned justice at Special Term, as they must be upon this appeal, it will be found that in at least two out of the four points involved this mode of presenting the question is as effective as any.

In order to understand clearly all of the questions arising upon this appeal it is necessary briefly to state the allegations contained in the moving and the opposing affidavits. The affidavit of the relator sets forth the passage of the act named. It also alleges the taking of the enumeration under chapter 5 of the Laws of 1892. This enumeration, as reported to the Legislature by the Secretary of State, contained three columns of figures; one being headed "Total inhabitants," the second "Total citizens" and the third "Total aliens," and exhibited by counties the total number of inhabitants, total citizens and total aliens throughout the various towns and cities in the State. Another exhibit annexed to the affidavit shows the details of the apportionment act, including both the senate and the assembly representative districts. This affidavit then sets forth the attitude of the Board of Supervisors of Monroe County, which it is unnecessary to repeat in this connection, as the same merely covers the four points against the constitutionality of the Apportionment Act upon which the respondent's counsel rely.

The opposing affidavits are two, one of them to the effect that, to the affiant's knowledge and belief, in most, if not all, of the counties of the State, there were, at the time of the taking of the enumeration and up to the present time, large numbers of persons of color who were not taxed, but who were *bona fide* inhabitants of the State of New York; and the other was that of a reporter for a newspaper who was present in the assembly chamber of the legislature on April 21, 1892, while the Assembly was in session, and who at that time heard a message read from the Governor calling a special session of the Legislature to be held at the Capitol, April 25, 1892, and that no particular subject for the consideration of the Legislature was mentioned in the call for such special session. Upon these facts it

is contended by the learned counsel for the defendant that the apportionment act, chapter 397 of the Laws of 1892, is unconstitutional and void for the reasons: (1.) That no constitutional enumeration can be made excepting in every tenth year after the year 1855. (2.) That the apportionment act, being chapter 397 of the Laws of 1892, was not passed at the first session after the enumeration was returned to the legislature, but at the same session. (3.) That the Secretary of State, in complying with section 12 of chapter 5 of the Laws of 1892, requiring him to prepare and report to the Legislature a general account of the enumeration, specifying the result thereof in the several election districts, towns and counties of the State, with a full recapitulation of the whole, did not report to the Legislature, and the legislature did not have before it, in enacting chapter 397, any enumeration report, tabulation or other information of the inhabitants of the State who are "persons of color not taxed." (4.) For the reason that gross and flagrant inequalities exist at large in the apportionment of members of the Assembly and Senate, set forth in chapter 397 of the Laws of 1892, and that the same particularly affect the county of Monroe to its detriment.

If the act in question be unconstitutional for any of the reasons alleged against it, this court possesses ample power to adjudge it to be unconstitutional. Under the Constitution the Supreme Court possesses general jurisdiction in law and equity, subject only to such appellate jurisdiction of the Court of Appeals as is prescribed by law.

If the legislature has transcended its constitutional powers, it is our duty to say so by our judgment, and we cannot avoid that duty in this instance any more than in any other instance. The Constitution is the act of the whole people of the State, and is the law of the land, and it is not in the power of the Legislature to violate any of its provisions. It was deliberately enacted as the guide to legislators as well as to courts; and though there may be no legal remedy against the Legislature or its members for a violation of its provisions, as there is against judges if they turn their backs upon it, yet the people have a remedy clear and distinct, and that is the requirement laid upon their courts to annul such unconstitutional laws because they are abhorrent to the sense of justice and right as expressed by the people themselves in their organic law. That which the Legislature cannot do by the terms of the Constitution, or

by necessary implication therefrom, it cannot do at all.   If the contention made against this almost elementary proposition should be maintained, there would be no room for courts in the land, but the contention is without reason to support it.

In the language of Daniel Webster : " Such a strange construction would render constitutional provisions of the highest importance completely inoperative and void.   It would tend directly to establish the union of all powers in the legislature.   There would be no general permanent law for courts to administer or men to live under. The administration of justice would be an empty form and idle ceremony.   Judges would sit to execute legislative judgments and decrees, not to declare or to administer the justice of the country."

The Constitution provides that the senate shall consist of thirty-two (32) members, and that the senators shall be chosen for two years ; that the assembly shall consist of 128 members, who shall be annually elected.   (Art. 3, § 2.)   The Senate is divided into thirty-two districts, called senate districts, each of which may choose one senator.   (Id., § 3.)   By section 4 of this article the enumeration of the inhabitants of the State is commanded to be taken under the direction of the legislature, in the year 1855, and at the end of every ten years thereafter ;· and the districts to be " so altered by the legislature, at the first session after the return of every enumeration, that each senate district shall contain, as nearly as may be, an equal number of inhabitants, excluding aliens and persons of color not taxed, and shall remain unaltered until the return of another enumeration, and shall at all times consist of contiguous territory ; and no county shall be divided in the formation of senate districts, except such county shall be equitably entitled to two or more senators." By section 5 the members of assembly " shall be apportioned among the several counties of the State by the Legislature, as nearly as may be, according to the number of their respective inhabitants, excluding aliens, and shall be chosen by single districts."   If any counties are entitled to two or more senators or members of assembly, it· is made the duty of the board of supervisors to " assemble, at such times as the Legislature making such apportionment shall prescribe, and divide their respective counties into Assembly districts, each of which districts shall consist of convenient and contiguous territory equal to the number of members of Assembly to which such counties

shall be entitled." "No town shall be divided in the formation of Assembly districts. Every county heretofore established and separately organized, except the county of Hamilton, shall always be entitled to one member of the Assembly," except that the counties of Hamilton and Fulton are deemed to be one county for such purpose, and entitled to but one member of assembly.

The enumeration directed by the Constitution to be made in the year 1885 was not made in that year, nor until this act in question was passed in 1892, seven years afterwards. The learned justice at Special Term did not consider that the first two questions, namely, that the enumeration was not taken in the tenth year after 1855, nor that the apportionment was made at the next session after the return of the enumeration, were open as original questions, but, on the contrary, he was of the opinion that they had been practically decided against the respondent in the cases of *Rumsey* v. *People* (19 N. Y., 45), and *State* v. *Cunningham* (51 N. W. Rep., 724); but it appears to me, from an examination of these authorities, that the point relating to the power of our extraordinary or special session of the legislature, called by the Governor, had not been directly up in either of them, so that the question has not been closed against the respondent by past adjudications of the courts. The direction of the Constitution that the enumeration shall be made at the end of every ten years after the year 1855 is, I think, a continuing duty resting upon each successive Legislature until such enumeration is actually made. As the legislature of 1885, owing to the veto of the Governor, failed to have such enumeration made under its direction, it was the duty of the succeeding Legislature to cause it to be done, and so on until it was actually done. This provision of the Constitution is not a mere privilege granted to the Legislature, nor a bare power which its members may exercise or not at the time designated, and if not timely exercised it is gone forever; it is rather a duty resting upon them, as the chosen instruments under the Constitution, for making suitable provision for a readjustment of the representation of the people in its legislative body.

But the Constitution has directed that the apportionment act shall be passed "at the first session after the return of every enumeration." This is, indeed, an additional requirement beyond those prescribed for ordinary legislation under article 3, section 1 of

the Constitution conferring general legislative power upon the Senate and Assembly. Under it the two houses of the Legislature have not the right to make the apportionment of senators and assemblymen at the same session at which the return of the enumeration was made. Though the Legislature has not in its own hands the power under the Constitution to do this act, it by no mean, follows that if an extraordinary session is appointed by the Governor that such apportionment may not be then made, although it is done in the same year of their previous session. The Constitution (art. 4, § 4), declares that "the Governor shall be Commander-in-Chief of the military and naval forces of the State. He shall have power to convene the Legislature (or the Senate only) on extraordinary occasions. At extraordinary sessions no subject shall be acted upon, except such as the Governor may recommend for consideration." Under this provision, if he were of the opinion that the exigencies of legislation required him to do so, the Governor had the power and it was his duty to call the Legislature together to consider the question of apportionment. A session so called is as much a constitutional session as the stated session. For one reason and another the enumeration had been delayed for seven years. At last it was taken, and if the apportionment during the decade for which the enumeration was directed by the Constitution to be taken was to be of any efficiency or value, it would seem that the exigency had arisen requiring the Governor to call the Legislature in extraordinary session in order that a year might be saved out of the three years remaining of the constitutional decade. It was a session that the Legislature could not themselves have appointed by adjournment or otherwise. The argument made in behalf of the respondent, it seems to me, confounds the expression at the first session after the return of every enumeration with the political year and legislative term. Happily, the Constitution has not left us in doubt as to the meaning of the legislative year, for section 6 of article 10 declares : "The political year and legislative term shall begin on the first day of January, and the Legislature shall every year assemble on the first Tuesday of January, unless a different day shall be appointed by law." That there may be more than one session of the Legislature during the legislative year, and that an extraordinary session may be the next session after the return of the enumeration to the Legis-

lature, if the Governor interposes his discretionary power so to reconvene that body, though in the same year, is, I venture to think, well shown by the Constitution itself, taken as a whole. For these reasons, the first two grounds for declaring the apportionment act unconstitutional cannot be upheld.

But it is contended, and it was so decided by the Special Term, that the senate apportionment is unconstitutional because, in estimating the number of its inhabitants in the new senate districts, persons of color not taxed were included. As has already been stated by the Constitution, the senate districts shall be so divided as to contain, " as near as may be, an equal number of inhabitants, excluding aliens and persons of color not taxed," etc. It is true, that each and every provision of the Constitution, whether wise or not, must be given force and effect, but in determining the scope and meaning of the Constitution, all of its parts must be regarded. When this provision of the Constitution was adopted in the year 1846, persons of color not having a property qualification were not only excluded from the enumeration in both senate and assembly districts, but were also excluded from the right to vote at general elections. In the amendment made to the Constitution in the year 1875, this provision, so far as it related to the assembly districts, was struck out, but, probably by an over-sight of the members of the constitutional convention, it was permitted to remain as applicable to the apportionment of senate districts. It was argued by the counsel for the relator that the fourteenth and fifteenth amendments to the Federal Constitution have abrogated this provision of the State Constitution, and rendered it nugatory. The fourteenth amendment referred to declares that no State shall make or enforce any law which shall abridge the privileges or immunities of any citizen of the United States. The fifteenth amendment merely declares that the right of the citizens of the United States to vote shall not be denied or abridged by the United States, or by any State, on account of race, color or previous condition of servitude. So long as our State Constitution does not deprive persons of color, who are citizens, of the privilege of voting, it does not contravene either of these amendments to the Federal Constitution. The power still remains in it to make any provision, even an arbitrary one, for the apportionment of senators and representatives in its

State legislature. Yet this provision of the Constitution has been wisely ignored by the Legislature, and by the common consent of the whole people of the State. The amendments to the Federal Constitution were adopted, respectively, in the years 1868 and 1870. Prior to the enumeration now in question there has been but one enumeration taken since that time, namely, that of 1875, and in that instance, too, as well as in this, persons of color not taxed were not excluded from the enumeration. Whether this was done under the mistaken notion that the Federal Constitution had abrogated these State provisions it is not necessary to pause to inquire. Yet, while persuaded that this part of the Constitution remains unaltered in words, I am not prepared to say that a failure to observe it can be successfully alleged as a reason for declaring the apportionment unconstitutional. The first reason for not so regarding it as an obstacle in the way of the apportionment act is that the question is forced into this controversy collaterally, and not directly. I do not see that the act of the legislature, if it were just and fair under the actual enumeration as returned to it, can be adjudged to be unconstitutional, because there was a technical defect in the mode in which the enumeration had been made and returned. What proceedings might have been instituted against it, either before or after its return to the legislature, by persons who imagined themselves aggrieved, it is not the province of the court now to say; but that an act of the Legislature, otherwise valid and of such vast importance as an act of apportionment, shall be declared to be unconstitutional, because of some defect in proceedings ante-dating such legislation, over which, as a legislature, it had no control, as it had not in this particular, is a proposition so at variance with my conception of the constitutional power of the court, and of their duty as to time and cause for exercising that power, that I cannot consent to it. In order to reach this end the court is asked, without proof, to take judicial notice that there exists in this State a large number of such persons. But, even if it were competent to do so, the assumption would not affect the validity of this act, unless it went a step further and assumed also that the distribution of such persons was so unequal among the counties as to affect rights of localities to representation in the Senate. This the court cannot do. We may, perhaps, take judicial notice of the

existence and general character of the *flora* and *fauna* of the earth, but not of their particular and comparative distribution. We may take judicial notice that roses bloom in summer, but hardly that more of them bloom in a plaintiff's garden than in a defendant's garden.

The fourth ground, namely, that the act is unconstitutional, because of the gross inequality in the apportionment of senators and assemblymen, is not so readily and satisfactorily disposed of. It is doubtful whether, under the Code, the record before us presents sufficient information for us to act upon. There has been returned to us the enumeration of the representative inhabitants, the apportionment of the senators and assemblymen among such inhabitants, and nothing else. The proposition is broadly presented to us, therefore, that in the exercise of the greatest powers possessed by a court we should, on examination of those tables, declare that the Legislature has committed a gross outrage upon the people. As was stated at the outset, the case comes up, not upon pleadings and findings, but upon an order refusing to direct a peremptory writ of *mandamus* to issue to the board of supervisors compelling it to reconvene. But, by section 2070 of the Code of Civil Procedure, such writ can be issued in the first instance, and without the intervention of an alternative writ with a right of demurring or answering, only when the applicant's right to the *mandamus* depends solely upon questions of law, and not upon questions of fact. Certain inequalities are stated in the briefs, and actually appear by comparison of the number of inhabitants of everal senate and assembly districts. Whether these inequalities could have. been all remedied and cured by the Legislature does not appear, particularly in regard to the apportionment of the senators. The provision of the Constitution that no county shall be divided in the formation of a senate district, unless such county is entitled to two or more senators, rendered inequality of distribution inevitable. I am in some doubt whether the learned justice at Special Term would have reached the conclusion that the inequalities of the senate districts were such as to warrant the interposition of the court. He says: "There can be no doubt that the apportionment of the several senate districts is so manifestly and flagrantly unequal as to amount to a clear violation of the constitutional requirement, as is also the undoubted disparity between the

number of inhabitants in the country as distinguished from city districts." But I am unable, from a comparison of the tables before me and without proof of some facts, other than those contained in this record, to say that the Legislature did not act, in making such distribution of the senators among the representative inhabitants, within the scope of the Constitution. The learned justice further says in his opinion: "It is clear, too, that the Constitution was grossly disregarded by giving to Albany county one more member of assembly than is allotted to Monroe, with over 24,000 more inhabitants, as well as allowing to Dutchess county, with 75,078 people, two members and to St. Lawrence, with 80,679, only one. These are violations which are clearly, utterly unnecessary, and because of them the act is void. The provisions of an act of this kind are so largely dependent upon each other that if part of them violate the Constitution the whole act must be declared void."

The total population of the State, according to the last enumeration for the purposes of representation in the Legislature, is 5,790,865. There being 128 assembly districts, if every county had a population sufficient to equal the quotient produced by dividing the number of inhabitants by the number of assembly districts, the distribution of assemblymen would be a comparatively easy matter, but the provision of the Constitution that each county shall have at least one member of assembly, however small its population, renders resort to an equitable, rather than to a mathematical, division necessary. The following method of calculation, whether it or some other was, in fact, pursued by the legislature or not, seems to be fair and equitable, and is one of the methods the propriety of which is not questioned by counsel. There are thirty counties having a population less than the number which would be produced by such division of the population by assembly districts, but the counties of Hamilton and Fulton are reckoned as one for the purposes of representation in the assembly. There are, therefore, twenty-nine districts which should be set apart as having the right to one assemblyman, though their population be less than that of the average. There remain ninety-nine assemblymen to be divided among a population of 4,831,162, which would give a member of assembly for every 48,799 representative persons. By the Act of the Legislature every county of the State was properly

divided upon this basis and the assemblymen mathematically apportioned among them; but from the nature of the case, after dividing the population of the counties by this divisor, there resulted certain remainders of representative person, sso that there were of the 128 members of assembly eleven undistributed by such a division. These, properly, should have been apportioned among the counties having the highest remainders. These counties are as follows, named in the order of their surplus representative population : Orange, 44,472 ; Onondaga, 44,460 ; Kings, 39,400 ; Ulster, 36,593 ; Monroe, 34,833 ; Steuben, 32,601 ; St. Lawrence, 31,880 ; Westchester, 31,226 ; Queens, 26,376 ; Dutchess, 26,276 ; Chautauqua, 25,085. The Legislature did proceed to add a member of assembly to each of the above first four counties containing the highest number of remainders, but it seemed to falter at such just arithmetic when it came to the county of Monroe, and gave no additional member to that county, but did, instead, award one to Steuben, the next highest on the list. It refused to give an additional one to St. Lawrence county, but gave it to the succeeding county, Westchester. It conferred another upon Queens and another upon Dutchess, but failed to give one to Chautauqua. In place of Monroe, St. Lawrence and Chautauqua, it gave an additional member to Albany county, which had a remainder of 10,351; another to New York county, which had a remainder of 8,813, and the other to Rensselaer, with a remainder of 24,081, none of the last named three counties being among the first eleven counties having the greatest remainders.

Though I do not hesitate to say that the Legislature should have pursued its original mathematical calculations and counting-house method clear through and awarded the eleven additional members to the eleven counties having the highest remainders, yet it does not follow that the court should overturn the entire apportionment act for these three discrepancies and errors. The question is not, I apprehend, what we, in our deliberation, may think should have been done by the Legislature in this regard; the question is whether or not, in arriving at the results, the Legislature has adopted any unconstitutional methods. So far as is ascertainable from these papers, it has observed the command of the Constitution, that no county shall be divided unless such county is entitled to two or more senators, and that the territory of each of such districts shall be contiguous.

No county having a full quota is deprived of the additional member of Assembly. In many cases, such, for instance, as appeals from awards of commissioners in condemnation proceedings, the courts refuse to vacate the reports made by the commissioners, although they do not meet completely the judgment of the court, unless it is made to appear that the commissioners, in arriving at their results, have adopted an erroneous method of calculation. So, in this case, we see that the provisions of the Constitution were all observed, and the apportionment made within its lines until the remainders for assembly districts came to be apportioned, and then, for some cause unexplained in these papers, but which we are bound to assume, in the absence of proof, was not a bad or corrupt cause, the Legislature placed three assemblymen where they should not have been placed, and took away three assemblymen from where they should have been placed if the highest remainders were to be followed. While this action cannot be approved by the court, nor by honest and reflective legislators, who must have for the moment weakly yielded their judgment to the stress of urgent legislation, I am not prepared to say that it affords sufficient ground for wholly setting aside the statute. In the cases of *Giddings* v. *Blacker, Secretary of State* (Supreme Court of Michigan, filed July 28, 1892), and *Board of Supervisors of Houghton County* v. *Blacker, Secretary of State* (Id.), the legislature had palpably violated the Constitution of the State in claiming the right, against a provision similar to ours, to dismember a county. The apportionment act of New York State has no such constitutional taint. It is doubtless a piece of legislation following the precedent of 1879, well up to the line of party aggrandizement, beyond which the Constitution says it shall not go. But so long as the Legislature pauses at such line, it is beyond the power of the court to interpose.

I think the motion for a *mandamus* should have prevailed, and that, consequently, the order appealed from should be reversed.

Order appealed from affirmed, with costs.